IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHRISTINE M. SPADY, et al.       :        CIVIL ACTION
                                 :
            v.                   :
                                 :
WESLEY COLLEGE                   :        NO. 09-834


MEMORANDUM

Bartle, C.J.                                September 29, 2010


            Christine Spady, Ronald Tate, James Frasier, and Alice
St. George (collectively, "plaintiffs") are four former employees
of defendant Wesley College ("Wesley"), who filed suit to redress
perceived violations of federal and state employment laws.  In
counts I and II of their complaint, plaintiffs assert that, while
employed, Wesley willfully failed to pay plaintiffs overtime as
required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C.
§§ 207, 215(a).[1]  In count III, plaintiffs allege they were
subjected to (1) a racially-hostile work environment and (2) a
racially-motivated termination, both in violation of 42 U.S.C.
§ 2000e-2(a)(2), -3(a)(3) and DEL. CODE ANN. tit. 19, § 711(b).

---

1.  Count I alleges Wesley violated the FLSA by failing to pay
plaintiffs time and a half for hours worked per week exceeding
40.  Count II alleges Wesley violated the FLSA by failing to pay
plaintiffs time and a half "during their meal periods and other
mandatory work periods."

Before the court is defendant's motion for summary judgment as to count III and for partial summary judgment as to counts I and II.

## I.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). At this stage, the court makes all reasonable inferences from the evidence in the light most favorable to the non-movant. In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

## II.

The following facts are either undisputed or viewed in the light most favorable to plaintiffs, the non-moving parties.

Plaintiffs began working as third-shift security guards at Wesley between 2004 and 2007. James Frasier began in 2004 and Ronald Tate in 2006, while Christine Spady and Alice St. George started in 2007. Ronald Tate was Wesley's third-shift security supervisor and the other plaintiffs reported to him. Tate, in turn, reported to Walter Beaupre, Wesley's director of campus safety and security.

-2-

On several occasions, Tate asked Beaupre for permission to draft standard operating procedures for the security guards he supervised.  Beaupre did not respond to Tate.  Similarly, Tate suggested to Beaupre that Wesley security staff receive training on the use of handcuffs and pepper spray.  Again, Beaupre did not respond to this suggestion.  Tate asked Beaupre for assistance in addressing malfunctions with electronic cards that third-shift personnel used to access the buildings they patrolled, but Beaupre declined to do so.  However, Beaupre did show Sam Crawford, the non-minority second-shift supervisor, how to fix the same problem.  Beaupre had more frequent interaction with the all-white security personnel on second shift than with the all-minority third shift staff.[2]

On two occasions, Beaupre ignored safety suggestions offered by Tate and Frasier but accepted those same suggestions when offered by a non-minority security officer.  During a dormitory open house, fire doors were propped open, and Beaupre ignored Frasier's suggestion that the doors be closed.  Beaupre agreed to close the doors when a non-minority officer proposed closing the doors.  On a separate occasion, Beaupre locked the main gate of Wesley's athletic stadium during an event.  Tate instructed Frasier to explain to Beaupre the potential safety concern created by locking the stadium gate.  Beaupre dismissed Frasier's suggestion but agreed to unlock the gate after Tate

---

2.  Neither side has indicated what hours Beaupre normally worked.

instructed a non-minority officer to discuss the safety concerns with Beaupre.

On three instances during 2007, a non-minority officer observed Crawford use a racial slur.  In two instances, Crawford used the slur to refer to a group of minority students.  In a third instance, the slur was used to refer to Tate.  During this third incident, Crawford admitted to opening and reviewing Tate's pay stub thereby learning that Tate was paid more than he.  No plaintiff was present for any of Crawford's racial epithets.  On September 2, 2007, the non-minority officer who observed all three incidents reported Crawford's use of racially-offensive language to Beaupre.  On September 5, 2007, Tate filed a complaint about Crawford's language and conduct during this third incident with Eric Nelson, Wesley's vice president of finance and director of human resources.

On or about September 5, 2007, Beaupre reported Crawford's conduct to Nelson, Beaupre's superior.  In response, Nelson gave Crawford a letter dated September 5, 2007 in which he said that racially-inappropriate language would not be tolerated at Wesley and that further similar incidents would result in Crawford's immediate termination.  On September 13, 2007, Nelson held a meeting with Tate, Christine Spady, and James Frasier (and two non-plaintiffs) to discuss Crawford's recent conduct.  Nelson explained that a colleague who had used racially-inappropriate language was being disciplined.  Nelson did not disclose the precise discipline to the group.  Nelson informed the group that

-4-

the college would not tolerate future instances of this conduct from Crawford.

On September 25, 2007, Crawford apologized to the entire college security staff for his language. Specifically, he said that "he must do better" and that "sometimes his words get ahead of his thinking." Near the time of Crawford's apology, Beaupre counseled Tate to "understand and realize where Crawford grew up." There is no evidence that Crawford used racist speech during the remainder of plaintiffs' employment.[3]

While plaintiffs worked for Wesley, the college treated them as employees exempt from the FLSA's overtime requirements. Accordingly, plaintiffs were not paid time and a half for hours worked per week exceeding 40. During plaintiffs' employment, however, Wesley maintained a "compensatory time" program for its FLSA-exempt employees. Wesley allowed exempt staff to have one hour of vacation for every hour in excess of 40 an employee worked. Plaintiffs Tate, St. George, and Frasier utilized this compensatory time program. Plaintiffs requested that Wesley pay them time and a half for overtime, but Wesley denied these requests.

Wesley terminated plaintiffs on February 13, 2008, allegedly after discovering that they had not entered certain

---

3. Plaintiffs suggest that Crawford subsequently used racially offensive language and allege Wesley did not discipline Crawford for his speech. This allegation in Tate's affidavit is plainly founded on inadmissible hearsay. Accordingly, the court does not consider it. See Fed. R. Civ. P. 56(e); Shelton v. Univ. of Med. & Dentistry of N.J., 233 F.3d 220, 223 n.2 (3d Cir. 2000).

campus buildings in conducting their campus patrols despite documentation in college records purporting to show the opposite. The circumstances surrounding the discovery of plaintiffs' failure to inspect the interiors of certain buildings, the frequency with which those failures occurred, the extent to which those failures contravened established college policies, and whether plaintiffs attempted to conceal any improper conduct with deceptive record-keeping are all disputed.

III.

Federal law prohibits employers from requiring employees to work in a "discriminatorily hostile or abusive environment." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); see 42 U.S.C. § 2000e-2(a)(1) (2006).  To establish a prima facie case of racial discrimination based on a hostile work environment, plaintiffs must prove that:  (1) they suffered intentional discrimination because of their race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected them; (4) the discrimination would negatively affect a reasonable person in the same position; and (5) respondeat superior liability exists. Jensen v. Potter, 435 F.3d 444, 449 & n.3 (3d Cir. 2006) (Alito, J.); Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).[4]

---

4.  Similarly, Delaware's Discrimination in Employment Act (DDEA) prohibits employment discrimination in statutory language nearly identical to Title VII.  See DEL. CODE ANN. tit. 19, § 711(b)
(continued...)

To prove the second element, a plaintiff must show "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 116 (internal quotations omitted). Courts must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998); <u>see</u> <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 116 & n.10. To justify relief, the offending conduct cannot consist of "offhanded comments, and isolated incidents (unless extremely serious)." <u>Faragher</u>, 524 U.S. at 788.

Applying this standard, our Court of Appeals, in <u>Davis v. City of Newark</u>, upheld the dismissal of a racially hostile work environment claim where the plaintiff police officer alleged that partners were assigned on a racial basis, that she was wrongly disciplined, that co-workers spoke only Spanish in her presence, that tires on her squad car were slashed, and that non-minority officers covered for each other when they missed shifts. 285 Fed. App'x 899, 901-02 (3d Cir. 2008).

---

4. (...continued)
(2010); <u>Schuster v. Derocili</u>, 775 A.2d 1029, 1033 (Del. 2001). We evaluate plaintiffs' DDEA claims under the same framework used to evaluate Title VII claims. <u>See</u> <u>Witcher v. Sodexho, Inc.</u>, 247 Fed. App'x 328, 329 n.1 (3d Cir. 2007); <u>Shah v. Bank of Am.</u>, 598 F. Supp. 2d 596, 602 n.6 (D. Del. 2009).

Evidence of tension between a supervisor and an
employee is not sufficient to show a hostile work environment.
In <u>Walton v. Mental Health Association of Southeastern
Pennsylvania</u>, the Court of Appeals upheld the district court's
grant of summary judgment where the plaintiff claimed that her
supervisor created a hostile work environment by threatening to
fire her, calling her "manic depressive," repeatedly calling her
while she was hospitalized, and forbidding other employees from
speaking with her while hospitalized.  168 F.3d 661, 667 (3d Cir.
1999).  In doing so, the court noted that evidence of a
plaintiff's poor relationship with her supervisor does not by
itself give rise to a hostile work environment claim.  <u>Id.</u>  More
recently, our Court of Appeals affirmed a grant of summary
judgment to an employer where a minority employee alleged his
supervisor called him a hypocrite and a liar, and treated him
more severely than other employees.  <u>Ahmed v. Lowe's Home
Centers, Inc.</u>, 346 Fed. App'x 816, 821 (3d Cir. 2009); <u>see</u> <u>Barber
v. Univ. of Med. and Dentistry of N.J.</u>, 118 Fed. App'x 588, 591
(3d Cir. 2004).

Our Court of Appeals has also held that sporadic or
isolated instances of racially-motivated jokes, racial slurs, and
displays of racist materials are not sufficient to support a
hostile work environment claim, especially when the offensive
conduct is not directed at the plaintiff or perceived by the
plaintiff first-hand.  <u>See</u> <u>Fuentes v. Borough of Watchung</u>, 286

-8-

Fed. App'x 781, 784 (3d Cir. 2008); <u>Carver v. City of Trenton</u>, 420 F.3d 243, 262-63 (3d Cir. 2005).

Plaintiffs Spady and St. George have established only that Beaupre did not interact with his minority third-shift subordinates as frequently as with his non-minority second-shift personnel.  Beaupre, however, was not Spady or St. George's direct supervisor.  In addition, on three instances, Sam Crawford, a more senior employee (but not the supervisor of Spady or St. George), used racially offensive language directed at others outside the plaintiffs' presence.  Crawford later apologized to plaintiffs for these remarks.  Based on these facts no reasonable jury could conclude that Spady or St. George worked in an environment with severe or pervasive racial discrimination.

As to Frasier, the only additional fact that he has provided is that on two occasions, Beaupre rejected his safety suggestion but accepted the same suggestion from a white officer. No jury could conclude that these two additional incidents combined with Beaupre's inattention and Crawford's racist speech resulted in a work environment with severe or pervasive racial discrimination.

Tate, the only plaintiff who submitted an affidavit, has set forth that on one occasion, Beaupre refused him training that Beaupre provided to Crawford.  Tate also has evidence that on one occasion, Crawford improperly reviewed Tate's pay stub and directed a racial slur at Tate, all outside of Tate's presence. Finally, according to Tate's affidavit, Beaupre did not respond

-9-

to Tate's request to draft standard operating procedures for the third shift or to Tate's suggestion that security staff receive training on use of pepper spray or handcuffs. These facts do not amount to the severe or pervasive racial discrimination required to establish a hostile work environment under Title VII.

Accordingly, the court will grant defendants partial summary judgment on count III of the complaint to the extent it states a hostile work environment claim under Title VII or the DDEA. However, the court finds that genuine issues of material fact preclude summary judgment on the wrongful termination claim in count III under either Title VII or the DDEA.

IV.

Counts I and II of plaintiffs' complaint state claims for willful violations of the FLSA arising from Wesley's treatment of plaintiffs as employees exempt from the overtime pay requirements of FLSA. Wesley asserts that, even if it violated the FLSA, no evidence exists from which a jury could conclude the violation was willful.

Willful violations of the FLSA are distinct from non-willful violations in that a willful FLSA violation allows the plaintiff to recover three years of damages. Non-willful violations only allow plaintiffs to recover two years of damages. See 29 U.S.C. § 255(a); McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133-34 (1988); Pignataro v. Port Auth. of N.Y. and N.J, 593 F.3d 265, 273 (3d Cir. 2010).

A willful FLSA violation requires proof that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin, 486 U.S. at 133.  The plaintiff must demonstrate that the employer acted with a level of culpability beyond mere negligence.  Id. at 134-35.  For example, an employer willfully violated the FLSA when he used a compensation regime he told an employee and his attorney he suspected was legally dubious, encouraged the employee to remain quiet about the regime's potential problem, and implemented the regime because of the high cost of paying the required hourly rates.  Martin v. Selker Bros., Inc., 949 F.2d 1286, 1298 (3d Cir. 1991).  In contrast, courts consistently have found employers did not act willfully when plaintiffs' only evidence of willfulness is that the employer did not heed the employees' request for additional compensation allegedly required by the FLSA.  See Pignataro, 593 F.3d at 273; Oakes v. Pennsylvania, 871 F. Supp. 797, 801 (M.D. Pa. 1995); McIntyre v. Div. of Youth Rehab. Servs., 795 F. Supp. 668, 674-75 (D. Del. 1992).

Plaintiffs have adduced no evidence whatsoever of Wesley's willfulness.  Plaintiffs assert that Wesley acted willfully because it offered compensatory time to plaintiffs for time worked over 40 hours per week and that this program did not comport with U.S. Department of Labor guidelines for administering compensatory time programs for non-exempt employees.  That Wesley elected to offer compensatory time to

-11-

employees they deemed exempt from FLSA does not show Wesley knew it was violating the FLSA or acted recklessly in determining whether plaintiffs were exempt from the FLSA.  This is true even if Wesley's compensatory time policy did not comply with U.S. Department of Labor standards governing similar programs for non-exempt positions.

At its root, plaintiffs evidence of willfulness is that they requested Wesley pay time and a half for overtime, and "[a] college such as Wesley should have known" the FLSA entitled them to that hourly rate.  Courts have consistently rejected this argument as insufficient to show an employer's willfulness. Pignataro, 593 F.3d at 273; Oakes, 871 F. Supp. at 801; McIntyre, 795 F. Supp. at 674-75.  We reject it as well.

Accordingly, defendant is entitled to partial summary judgment on counts I and II of the complaint to the extent those counts claim willful violations of the FLSA.